**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS MIDLAND/ODESSA DIVISION**

| | |
|---|---|
| NEURAL AI, LLC,<br><br>Plaintiff,<br><br>v.<br><br>NVIDIA CORPORATION,<br><br>Defendant. | Case No. 7:24-cv-00221-LS-DTG<br><br>**JURY TRIAL DEMANDED** |

**DEFENDANT NVIDIA CORPORATION'S OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL THE DEPOSITION OF JENSEN HUANG**

## TABLE OF CONTENTS

Page


I. INTRODUCTION .......... 1

II. LEGAL STANDARDS .......... 1

III. ARGUMENT .......... 3

A. NAI Has Not Shown That Mr. Huang Possesses Unique, Relevant Knowledge .......... 3

1. The Existing Record Answers What Happened Before, During, And After The June 2017 Call .......... 4

2. NAI's Additional Conjecture Supplies No Basis To Depose Mr. Huang .......... 6

3. NAI Already Deposed The NVIDIA Executives Responsible For The Neurala Relationship .......... 8

B. The Burden Of Deposing Mr. Huang Is Disproportionate To Any Benefit .......... 9

IV. CONCLUSION .......... 10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple Inc. v. Samsung Electronics Co.,*
282 F.R.D. 259 (N.D. Cal. 2012) .......... 3

*In re Application of Oasis Focus Fund LP*,
2023 WL 6278882 (W.D. Tex. Sept. 26, 2023) .......... 2

*Beeman v. Protective Life Corp.*,
2020 WL 13656058 (N.D. Ala. May 28, 2020) .......... 8

*Buchholz v. Crestbrook Insurance Co.,*
2021 WL 3571277 (W.D. Tex. Aug. 11, 2021) .......... 3

*Cannon v. Burge*,
2007 WL 2410392 (N.D. Ill. Aug. 20, 2007) .......... 6

*Ceiva Logic, Inc. v. Amazon.com, Inc.*,
2021 WL 12349625 (C.D. Cal. Nov. 10, 2021) .......... 2

*Computer Acceleration Corp. v. Microsoft Corp.*,
2007 WL 7684605 (E.D. Tex. June 15, 2007) .......... 2

*Crosby v. La. Health Serv. & Indem. Co.*,
647 F.3d 258 (5th Cir. 2011) .......... 1

*In re Google Litigation,*
2011 WL 4985279 (N.D. Cal. Oct. 19, 2011) .......... 3

*In re Oasis Focus Fund LP*,
2023 WL 7238594 (W.D. Tex. Nov. 2, 2023) .......... 2

*PA Advisors, LLC v. Google, Inc.*,
2009 WL 10741630 (E.D. Tex. Aug. 28, 2009) .......... 9

*Robinson v. Nexion Health at Terrell, Inc.*,
2014 WL 12915533 (N.D. Tex. Apr. 16, 2014) .......... 2

*Salter v. Upjohn Co.*,
593 F.2d 649 (5th Cir. 1979) .......... 2

*Simms v. National Football League,*
2013 WL 9792709 (N.D. Tex. July 10, 2013) .......... 3

*Texas v. Google LLC*,
347 F.R.D. 490 (E.D. Tex. 2024) .......... 3

*ZeniMax Media v. Oculus VR,*
2015 WL 13949662 (N.D. Tex. Dec. 7, 2015) .......... 3

**Rules**

Fed. R. Civ. P. Rule 26(b)(1), 26(c)(1) .......... 1

Fed. R. Civ. P. Rule 26 .......... 1, 6

Fed. R. Civ. P. Rule 30(b)(6) .......... 8, 9, 10

## TABLE OF ABBREVIATIONS

| Abbreviation | Term |
|---|---|
| ’867 Patent | U.S. Patent No. 8,648,867 |
| AI | Artificial intelligence |
| Asserted Patents | U.S. Patent Nos. 8,648,867, RE48,438, RE49,461 |
| Motion, Mot. | Neural AI, LLC’s Motion To Compel the Deposition of Jensen Huang (D.I. 199) |

## TABLE OF EXHIBITS

| Exhibit* | Document |
|---|---|
| 34 | NEURALA_0005969 (Jetson Press Release) |
| 35 | July 31, 2026 Deposition Transcript of Deepu Talla |
| 36 | July 29, 2026 Deposition Transcript of Murali Gopalakrishna |
| 37 | NEURALA_0014150 (May 22, 2017 Email from L. Farinas) |
| 38 | NAI_0753171 (Versace Consulting Agreement) |
| 39 | Excerpt of the Rough Draft of the September 16, 2026 Deposition Transcript of Daniel Glasser |
| 40 | Excerpt of the August 11, 2026 Deposition Transcript of Anatoli Gorchet |
| 41 | Excerpt of the August 14, 2026 Deposition Transcript of Heather Ames Versace |
| 42 | Plaintiff Neural AI, LLC's Rules 26 (a)(1) Initial Disclosures, dated July 30, 2025 |
| 43 | Plaintiff Neural AI, LLC's Fifth Supplemental Responses and Objections to Defendant NVIDIA Corporation's First Set of Interrogatories (Nos. 1-13), dated August 10, 2026 |
| 44 | NVIDIA-NAI-2165572 (June 6, 2017 Email from J. Huang) |
| 45 | NVIDIA FY2025 10-K |
| 46 | Business Insider, Jensen Huang's 14-hour days and workaholic lifestyle helped him turn NVIDIA into an AI powerhouse, September 12, 2024, https://www.businessinsider.com/jensen-huang-nvidia-routine-management-leadership-style-ceo-founder-2024-4 |
| 47 | Excerpt of the Rough Draft of the September 16, 2026 Deposition Transcript of Max Versace |

*Exhibits 1–33 were previously filed with Neural AI, LLC's Motion To Compel the Deposition of Jensen Huang (D.I. 199, "Mot.").

## I. INTRODUCTION

NAI's attempt to depose NVIDIA's President and CEO, Jensen Huang, should be denied under the *Apex* doctrine and Rule 26. NAI's basis for requesting the deposition of NVIDIA's CEO is a single decade-old call and a handful of emails that Mr. Huang forwarded without substantive comment. NAI has not come anywhere near satisfying its burden under Rule 26 to compel the CEO of a global company with over 40,000 employees to prepare and sit for a deposition.

Discovery taken by NAI shows that Mr. Huang does not possess the unique, relevant knowledge required under the *Apex* doctrine. The brief call did not discuss any assertion of infringement, licensing, or patent value. NAI's witness Dr. Versace was the only other participant and testified that his contemporaneous notes—which NAI has long possessed—accurately memorialized the call for Neurala's leadership. NAI also identifies no emails where Mr. Huang discusses an asserted patent or provides any substantive analysis of Neurala's technology or investment potential. Instead, the scant few emails cited by NAI show Mr. Huang's lack of substantive involvement. And other emails that NAI did not cite show that Mr. Huang did not even know what Neurala's product was after the call.

NAI has failed to identify any material, relevant knowledge uniquely possessed by Mr. Huang. Its motion should be denied.

## II. LEGAL STANDARDS

Rule 26 restricts discovery to that which is relevant and "proportional to the needs of the case," and authorizes courts to protect witnesses from "annoyance, embarrassment, oppression, or undue burden or expense," Fed. R. Civ. P. 26(b)(1), 26(c)(1). The Fifth Circuit emphasizes Rule 26 is not "a license to engage in an unwieldy, burdensome, and speculative fishing expedition." *Crosby v. La. Health Serv. & Indem. Co.*, 647 F.3d 258, 264 (5th Cir. 2011) (cleaned up).

As a result, courts in this Circuit have long recognized that for senior executives, "[u]nless

the executive possesses 'unique personal knowledge' about the controversy, the court should regulate the discovery process to avoid 'oppression, inconvenience, and burden' to the executive and the corporation." *Robinson v. Nexion Health at Terrell, Inc.*, 2014 WL 12915533, at *2 (N.D. Tex. Apr. 16, 2014) (quoting *Computer Acceleration Corp. v. Microsoft Corp.*, 2007 WL 7684605, at *1 (E.D. Tex. June 15, 2007)); *In re Application of Oasis Focus Fund LP*, 2023 WL 6278882, at *8 (W.D. Tex. Sept. 26, 2023) ("Where a party seeks to take the deposition of a high-level, or apex, executive, the Fifth Circuit 'has recognized the need for first utilizing less-intrusive means [of discovery] before taking such [a] deposition.'"), report and recommendation adopted *sub nom. In re Oasis Focus Fund LP*, 2023 WL 7238594 (W.D. Tex. Nov. 2, 2023); *Salter v. Upjohn Co.*, 593 F.2d 649, 651 (5th Cir. 1979).

An executive does not possess "unique personal knowledge" where such knowledge is irrelevant to the claims and defenses, does not go "beyond what is revealed in the documents themselves" or where "the opposing party can obtain the information it seeks through less-intrusive means." *Oasis*, 2023 WL 6278882, at *8; *Computer Acceleration*, 2007 WL 7684605, at *1; *Ceiva Logic, Inc. v. Amazon.com, Inc.*, 2021 WL 12349625, at *9, *15–16 (C.D. Cal. Nov. 10, 2021) (denying request to depose CEO to uncover his own "state of mind and personal beliefs").

Courts applying these principles distinguish between senior executives who substantively participated in conduct directly at issue and executives whose involvement consisted of receiving information or directing work to others. In *Computer Acceleration*, emails showed Bill Gates directed and encouraged employees to accelerate the boot time of Microsoft programs. 2007 WL 7684605, at *1. But the court denied his deposition because the plaintiff did not show he possessed "firsthand and non-repetitive knowledge" that is "unique" or "unavailable from lower-level employees" who performed the work. *Id.* Likewise, in *Buchholz v. Crestbrook Insurance Co.*, a

court in this District declined to compel a company president who requested review of the claims at issue, received an explanation of the claims, and asked questions because he lacked "unique personal knowledge" and the substantive work and decisions were handled by others. 2021 WL 3571277, at *2–3 (W.D. Tex. Aug. 11, 2021).

The cases NAI cites are inapposite. In *Texas v. Google LLC*, Sergey Brin personally participated in the challenged acquisition, expressed views concerning the target's value, and recommended increasing Google's bid. 347 F.R.D. 490, 499–500 (E.D. Tex. 2024). *ZeniMax Media v. Oculus VR* likewise involved Mark Zuckerberg's "active participation" in Facebook's acquisition of Oculus, including his own decision to acquire Oculus and his valuation of it after testing the headset alleged to embody the misappropriated technology. 2015 WL 13949662, at *2 (N.D. Tex. Dec. 7, 2015). *Apple Inc. v. Samsung Electronics Co.* permitted executive depositions where the executives had personally overseen relevant projects or issued substantive directives concerning the matters at issue. 282 F.R.D. 259, 265–68 (N.D. Cal. 2012). At the same time, the *Apple* court denied the deposition of another senior executive despite evidence that he discussed the relevant competitive issue, gave product-design instructions, and reviewed product mockups. *Id.* at 265–66. In *In re Google Litigation*, Page was compelled because he and Brin had themselves "created and developed" the accused technology and co-authored the seminal paper describing it. 2011 WL 4985279, at *1–2 (N.D. Cal. Oct. 19, 2011). Similarly, in *Simms v. National Football League*, the court permitted the deposition of Commissioner Roger Goodell where other witnesses could not explain Goodell's own statements accepting responsibility for the events at issue. 2013 WL 9792709, at *3–5 (N.D. Tex. July 10, 2013). As detailed below, none of those facts applies.

## III. ARGUMENT

### A. NAI Has Not Shown That Mr. Huang Possesses Unique, Relevant Knowledge

NAI relies on Mr. Huang's June 2017 call with Dr. Versace and a handful of emails to

argue Mr. Huang possesses unique, relevant knowledge. But the existing record already answers why Mr. Huang contacted Neurala, what was discussed, and what NVIDIA did afterward. NAI identifies no unique, relevant information possessed by Mr. Huang to justify his deposition.

### 1. The Existing Record Answers What Happened Before, During, And After The June 2017 Call

NAI's argument centers on Mr. Huang's June 2017 call with Dr. Versace, but NAI already knows what happened before, during, and after the call.

The contemporaneous documents show the few times Mr. Huang even mentioned Neurala before the June 2017 call. In March 2016, [redacted] Ex. 12 at 2. Ten months later, after Neurala announced Series A financing, he asked again: [redacted] Ex. 13. By then, Neurala was a publicly announced member of the NVIDIA Jetson Embedded Platform ecosystem for seven months, under a June 14, 2016 press release quoting Dr. Talla. Ex. 34; Ex. 35 at 33:10–34:13, 70:16–17. And in May 2017, Mr. Huang [redacted] Ex. 14. As Mr. Gopalakrishna explained, "[redacted] Ex. 36 at 87:5–10, 90:1–9. NVIDIA then contacted Neurala about that project, explaining [redacted] Ex. 37 at 5. Shortly thereafter, Mr. Huang and Dr. Versace arranged the call. *Id.* at 2–3.

NAI also already knows what was discussed on the call. Dr. Versace—the only other participant, NAI's own witness, and a consultant retained specifically for this litigation—memorialized the call contemporaneously for Neurala's leadership. Ex. 18; Ex. 38. Dr. Versace and his notes confirmed that infringement concerns and patent licensing were not discussed on the

call. Ex. 47 at 303:6–12; Ex. 18. Instead, Dr. Versace's notes recount a discussion of [redacted] *Id.* Dr. Versace confirmed those notes accurately summarized the meeting. Ex. 47 at 298:3–300:12; *see also* Ex. 39 at 166:17–169:23; Ex. 40 at 263:14–266:16; Ex. 41 at 339:6–341:12.

The documentary record shows exactly what happened after the call too. Mr. Huang handed the follow-up to the NVIDIA personnel responsible for the relevant matters. He told Dr. Versace: [redacted] Ex. 20. At the time, Mr. Herbst led NVIDIA's GPU Ventures group and was evaluating Neurala for investment; Dr. Talla ran NVIDIA's robotics and edge-computing business and supplied the product group's investment recommendation; and Mr. Gopalakrishna was head of product management for NVIDIA's Jetson product line—the platform Neurala was using. Ex. 35 at 15:8–16:3; Ex. 36 at 21:12–23.

When NVIDIA arranged a follow-up meeting with Neurala, Mr. Huang did not attend. Dr. Versace asked him to participate, but his office responded that he was [redacted] Ex. 22 at 5. Dr. Talla's group and Mr. Herbst's team evaluated the [redacted] Ex. 35 at 31:18–32:4. As Dr. Talla—who personally attended the meeting—explained, NVIDIA's evaluation [redacted] *Id.* at 65:19–66:12. Dr. Talla likewise testified that, [redacted] *Id.* at 64:18–65:10; *see also id.* at 69:13–25.

**2. NAI's Additional Conjecture Supplies No Basis To Depose Mr. Huang**

NAI raises several other arguments about Mr. Huang's alleged relevance to the case, but none of them identify any credible basis for deposing him.[1]

First, NAI says Mr. Huang "personally evaluated" Neurala's technology and investment potential. Mot. at 4. But NVIDIA produced more than 7,000 emails from Mr. Huang's custodial files in response to NAI's search terms, and NAI identifies no emails in which Mr. Huang discusses an asserted patent or provides substantive analysis of Neurala's technology or investment potential. Rather than accept what the record shows—that no such analysis was performed—NAI speculates that Mr. Huang might have harbored additional, undocumented views about Neurala, calling his emails "cryptic," emphasizing that some were sent "without comment," and asserting that it remains "unclear what he thought." *Id.* at 4, 6–8. But Mr. Huang's [redacted], Ex. 35 at 77:20–78:1, 79:18–22, 82:25–83:6, and NAI's speculation about emails that Mr. Huang simply forwarded is insufficient to compel his deposition.

Second, NAI contends that Mr. Huang's resulting "perception," his "thought processes regarding Neurala and its technology," and his "understanding of whether NVIDIA already practiced the technology Neurala presented to him" are uniquely his. Mot. at 4–6. But just one

[1] NAI's eleventh hour request for Mr. Huang's testimony also conflicts with its prior discovery responses. NAI's July 2025 initial disclosures identified 36 NVIDIA employees, including 13 it claimed were likely to have information concerning "[c]ommunications with Neurala related to the Asserted Patents." Ex. 42 at 8–9. But Mr. Huang was not among them, and NAI never supplemented its disclosures to add him. Interrogatory No. 7 required NAI to "identify and describe in detail any evidence that [NAI] assert[s] shows that NVIDIA possessed knowledge of the Asserted Patent [or] knowledge of any alleged infringement of the Asserted Patent." Ex. 43 at 30. NAI identified 2015 and 2017 interactions between NVIDIA and Neurala as evidence of pre-suit knowledge but did not identify Mr. Huang as having unique knowledge. *Id.* at 30–32. Likewise, Interrogatory Nos. 4 and 5 required NAI to identify the facts and persons supporting its theories concerning patent valuation and damages. *Id.* at 17–26. Mr. Huang appears nowhere in those responses either. *Cannon v. Burge*, 2007 WL 2410392, at *3 (N.D. Ill. Aug. 20, 2007) (treating plaintiff's failure to identify a witness in its contemporaneous Rule 26 disclosures as undermining its later claim that he was an "important fact witness").

day after speaking with Dr. Versace, Mr. Huang asked his own team [redacted] Ex. 44. He formed no technical assessment of Neurala because he did not undertake one—[redacted] Ex. 36 at 93:6–94:1 (immediately after the call, Mr. Huang [redacted]); *id.* at 117:5–13.

Third, after the June 2017 meeting that Mr. Huang did not attend, Mr. Gopalakrishna conveyed the [redacted] with a presentation provided by Neurala. Exs. 22–23. Though the '867 Patent appears twice in that presentation, Ex. 23 at 10, 18, there is no evidence that Mr. Huang opened it, noticed the isolated patent references, or formed a view on the patent. And there would be no reason to do so based on the team's recommendation [redacted] Ex. 22. The evidentiary record supports the same—Mr. Huang never responded to the email, Ex. 36 at 153:6–8, and no investment was made. NAI's conjecture is contrary to the evidence and provides no basis to depose Mr. Huang.

Fourth, the 2018 exchange is similar. Another NVIDIA employee—not Mr. Huang—asked whether Neurala was [redacted] to NVIDIA, and a second employee responded with a comment and specification excerpts of a Neurala patent directed to autonomous-robot vision that is not asserted here. Ex. 24 at 3. Mr. Huang forwarded the exchange, without comment, to the executives responsible for NVIDIA's robotics business. *Id.* at 1. Dr. Talla explained why: Mr. Huang was passing along information about [redacted] Ex. 35 at 81:1–12.

Fifth, NAI cites the fact that Mr. Huang emailed about other startups, not Neurala, to suggest that some undocumented Neurala analysis might be missing. Mot. at 1–2 (citing Exs. 3–4, 6). But all those emails show is substantive directions from Mr. Huang were memorialized in

email. Dr. Talla likewise testified: [redacted] Ex. 35 at 97:6–17. Nothing in the more than 7,000 emails produced from Mr. Huang's files reflects any substantive analysis by Mr. Huang of a Neurala patent or NVIDIA's alleged infringement. That is because no such analysis occurred.

Finally, Mr. Huang's general approval authority does not establish unique knowledge. NAI notes Mr. Huang would have needed to [redacted]. Mot. at 6–7. But Mr. Huang was never presented with a license and never rejected a Neurala investment—NVIDIA's investment team [redacted]. Ex. 36 at 156:24–157:14; *id.* at 152:9–12, 153:12–24. Even if either transaction had reached Mr. Huang, authority to approve a transaction does not, without more, establish unique knowledge. *Beeman v. Protective Life Corp.*, 2020 WL 13656058, at *5 (N.D. Ala. May 28, 2020) (rejecting a "the-buck-stops-here" argument to compel an executive deposition because "[b]y that logic, Bill Gates would have been fair game to be deposed in virtually every lawsuit against Microsoft").

### 3. NAI Already Deposed The NVIDIA Executives Responsible For The Neurala Relationship

NAI already deposed Dr. Talla and Mr. Gopalakrishna, the NVIDIA executives with first-hand knowledge of the relevant Neurala matters, each of whom NVIDIA prepared and designated as its Rule 30(b)(6) witnesses on those topics. *Supra* at 5.

Dr. Talla was prepared to testify on the relevant topics because he was the NVIDIA executive responsible for the Neurala relationship. Dr. Talla did not need to interview Mr. Huang because he was [redacted] Ex. 35 at 10:20–25; *id.* at 45:17–23. Dr. Talla also confirmed his first-hand involvement made him the better source. Asked whether he or Mr. Huang was [redacted] in the exhibits before him, Dr.

Talla answered: [redacted] *Id.* at 95:14–18. Dr. Talla was [redacted] *Id.* at 95:9–96:15.

These Rule 30(b)(6) witnesses addressed the issues NAI now says require Mr. Huang's deposition. Mr. Gopalakrishna testified that [redacted] Ex. 36 at 60:4–11, 72:20–23, 168:2–4, 169:7–20. Dr. Talla testified [redacted]. Ex. 35 at 26:11–17; 27:12–20, 30:5–14, 97:6–17. NAI has already obtained testimony on the topics it says warrant Mr. Huang's deposition. There is no basis to depose Mr. Huang on those same topics, especially when he is not the most knowledgeable source, let alone has unique relevant knowledge to add.

**B. The Burden Of Deposing Mr. Huang Is Disproportionate To Any Benefit**

Deposing Mr. Huang would require NVIDIA's President and CEO to divert time from leading a global company with approximately 42,000 employees across 38 countries to prepare for and testify about interactions dating back nearly a decade. Ex. 45 at 11. Indeed, Mr. Huang works 14-hour days, every day, and has dozens of direct reports with whom he speaks with regularly. Ex. 46. As in *PA Advisors*, where the court precluded the deposition of Google's President of Technology in view of the burden caused by the "significant disruption to [Google's] operations" and its over 20,000 employees, Mr. Huang's deposition would be incredibly burdensome and disruptive to NVIDIA. *PA Advisors, LLC v. Google, Inc.*, 2009 WL 10741630, at *2–3 (E.D. Tex. Aug. 28, 2009). NAI already has Dr. Versace's contemporaneous account of the only one-on-one call, the surrounding communications, Neurala's corporate testimony, over 7,000 of Mr. Huang's

emails, and testimony from the NVIDIA personnel who were responsible for the Neurala relationship. Requiring NVIDIA's CEO to prepare and sit for a deposition to search his memory for uncommunicated impressions untethered to any identified issue in the case is disproportionate.

As explained above and summarized below, NAI's reasons for deposing Mr. Huang fail.

| **NAI's Category (Mot. at 6)** | **Why It Does Not Support Deposing Mr. Huang** |
|---|---|
| (1) "his perception from interactions directly with Neurala, including an hour-long one-on-one with an inventor" | Dr. Versace—NAI's own witness and retained consultant—made contemporaneous notes of the call, which NAI has had throughout this case. Ex. 18. The next day, Mr. Huang asked his team [redacted], and the resulting follow-up was documented in email. Ex. 44; Ex. 20; Ex. 35 at 26:11–17, 27:12–20, 97:6–17. |
| (2) "his reasons for sending and meaning behind certain cryptic emails about Neurala" | NVIDIA's designees explained Mr. Huang's practice: [redacted] Ex. 35 at 77:20–78:1, 79:18–22, 81:1–12, 82:25–83:6; 95:9–96:15; Ex. 36 at 87:5–10. |
| (3) "to whom he discussed and shared the information he gained about Neurala, and his thoughts" | The emails themselves show who Mr. Huang shared information with, and Dr. Talla testified that [redacted] Ex. 35 at 26:11–17, 97:6–17. |
| (4) "his thought processes regarding Neurala and its technology" | NVIDIA's assessment of Neurala was handled by NVIDIA's Rule 30(b)(6) designees Dr. Talla and Mr. Gopalakrishna. Ex. 36 at 93:6–94:1, 117:5–13, 152:9–12; Ex. 35 at 64:18–65:10, 69:13–25. |
| (5) "his understanding of whether NVIDIA already practiced the technology Neurala presented to him" | NAI never asked any NVIDIA designee whether Mr. Huang held such a view. NVIDIA witnesses testified NVIDIA [redacted] Ex. 36 at 60:4–11, 72:20–23. |
| (6) "whether he shared the patents in suit with anyone within NVIDIA" | The record shows patent information was not sent to NVIDIA's legal or patent personnel. Ex. 36 at 168:2–4, 169:7–20. |
| (7) "his reason for not approving a Neurala investment" | There was no Neurala investment for Mr. Huang to approve. The responsible personnel recommended [redacted] and conveyed that recommendation to him. Ex. 36 at 152:9–12, 157:3–14. |

## IV. CONCLUSION

For the foregoing reasons, NVIDIA respectfully requests that the Court deny NAI's motion to compel the deposition of Jensen Huang.

Dated: September 18, 2026

By *\/s/ Brian A. Rosenthal*

Brian A. Rosenthal
Paul E. Torchia
Vivian Lu (*pro hac vice*)
Gillian F. Moore (*pro hac vice*)
Karl W. Kowallis (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000
brosenthal@gibsondunn.com
ptorchia@gibsondunn.com
vlu@gibsondunn.com
gmoore@gibsondunn.com
kkowallis@gibsondunn.com

Brian M. Buroker
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036-4504
(202) 955-8541
bburoker@gibsondunn.com

Casey J. McCracken (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA 92612-4412
(949) 451-3932
cmccracken@gibsondunn.com

Nathan R. Curtis (*pro hac vice*)
GIBSON DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201-2923
(214) 698-3423
ncurtis@gibsondunn.com

Lillian J. Mao (*pro hac vice*)
GIBSON DUNN & CRUTCHER LLP
310 University Avenue
Palo Alto, CA 94301-1744
(650) 849-5307
lmao@gibsondunn.com

Benjamin N. Luehrs (SBN: 440317)
Tamir Packin (*pro hac vice*)
Steven M. Balcof (*pro hac vice*)
Joze Welsh (*pro hac vice*)

Jordan Owens (*pro hac vice*)
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
(212) 351-3400
bluehrs@desmaraisllp.com
tpackin@desmaraisllp.com
sbalcof@desmaraisllp.com
jwelsh@desmaraisllp.com
jowens@desmaraisllp.com

Brooke A. Miller (*pro hac vice*)
DESMARAIS LLP
1899 Pennsylvania Avenue NW
Washington, DC 20006
(202) 451-4900
bmiller@desmaraisllp.com

Barry K. Shelton
(TX State Bar No. 24055029)
Bradley D. Coburn
(TX State Bar No. 24036377)
SHELTON COBURN LLP
311 RR 620 S, Suite 205
Austin, TX 78734-4775
(512) 263-2165
bshelton@sheltoncoburn.com
coburn@sheltoncoburn.com

***Counsel for Defendant NVIDIA Corporation***

**CERTIFICATE OF SERVICE**

I certify that the foregoing document was served electronically on September 18, 2026, on all counsel who have consented to electronic service.

*/s/ Brian A. Rosenthal*